**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.* | ) | Case No. 09-10138 (KG) |
| | ) | Jointly Administered |
| Debtors | ) | |

_____

| | | |
|---|---|---|
| | ) | |
| ROBERT HORNE, MASON JAMES YOUNG, | ) | |
| ELLEN BOVARNICK, CHARLA CRISLER, BART | ) | |
| KOHNHORST, BRIAN PAGE, BENJAMIN | ) | |
| WARREN, and the AD HOC GROUP OF | ) | Adv. Proc. No. 11-_____ |
| BENEFICIARIES OF THE NORTEL NETWORKS | ) | |
| U.S. DEFERRED COMPENSATION PLAN, For | ) | |
| Themselves And All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTEL NETWORKS INC., NORTEL NETWORKS | ) | |
| CAPITAL CORPORATION, NORTEL | ) | |
| ALTSYSTEMS INC., NORTEL ALTSYSTEMS | ) | |
| INTERNATIONAL INC., XROS, INC., SONOMA | ) | |
| SYSTEMS, QTERA CORPORATION, CORETEK, | ) | |
| INC., NORTEL NETWORKS APPLICATIONS | ) | |
| MANAGEMENT SOLUTIONS INC., NORTEL | ) | |
| NETWORKS OPTICAL COMPONENTS INC., | ) | |
| NORTEL NETWORKS HPOCS INC., ARCHITEL | ) | |
| SYSTEMS (U.S.) CORPORATION, NORTEL | ) | |
| NETWORKS INTERNATIONAL INC., NORTHERN | ) | |
| TELECOM INTERNATIONAL INC., NORTEL | ) | |
| NETWORKS CABLE SOLUTIONS INC., NORTEL | ) | |
| NETWORKS (CALA) INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| U.S. BANK, N.A., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| | ) | |

_____

|  |  |
|---|---|
| ROBERT ELLIS BROWN, FRANK C. CARLUCCI, L. YVES FORTIER, SHERWOOD HUBBARD SMITH, JR., LYNTON RONALD WILSON, WILLIAM ARTHUR OWENS, ROBERT ALEXANDER INGRAM, RICHARD DAVID MCCORMICK, HARRY JONATHAN PEARCE, JALYNN HAMILTON BENNETT, JOHN ALAN MACNAUGHTON, JOHN PAUL MANLEY, MANFRED BISCHOFF, AND KRISTINA MARY JOHNSON, In Their Capacities As Members Of The Board of Directors Compensation Committee That Functioned As The Plan Administrator Of The Nortel Networks U.S. Deferred Compensation Plan, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER EQUITABLE RELIEF -- CLASS ACTION**

Plaintiffs Robert Horne ("Horne"), Mason James Young ("Young"), Ellen Bovarnick ("Bovarnick"), Charla Crisler ("Crisler"), Bart Kohnhurst (Kohnhurst"), Brian Page ("Page"), Benjamin Warren ("Warren"), and the Ad Hoc Group of Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan (the "Ad Hoc Group") (Horne, Young, Bovarnick, Crisler, Kohnhurst, Page, Warren, and the Ad Hoc Group, collectively, "Plaintiffs") for themselves and all other similarly situated participants in or beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan (collectively, along with Plaintiffs, the "Beneficiaries"), by and through their undersigned counsel, hereby file this Complaint against Defendants Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc, Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel

Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc., (collectively, the "Debtors"), U.S. Bank, N.A., ("US Bank"), and Robert Ellis Brown, Frank C. Carlucci, L. Yves Fortier, Sherwood Hubbard Smith, Jr., Lynton Ronald Wilson, William Arthur Owens, Robert Alexander Ingram, Richard David McCormick, Harry Jonathan Pearce, Jalynn Hamilton Bennett, John Alan MacNaughton, John Paul Manley, Manfred Bischoff, and Kristina Mary Johnson in their capacity as members of the Board of Directors Compensation Committee that functioned as the Plan Administrator of the Nortel Networks U.S. Deferred Compensation Plan (collectively, the "Committee" and, individually, "Committee Member") (the Debtors, US Bank, and the Committee, collectively, "Defendants").

### Nature Of The Action

1.      This is an action, *inter alia*, to resolve competing claims by the Beneficiaries and the Debtors to funds being held in a trust by US Bank.

2.      The disputed trust assets are comprised of (a) amounts withheld from the salaries and wages of participants and deposited in the trust as employee contributions in connection with a deferred compensation plan  (the "Nortel Plan" or the "DCP"); and (b) the investment returns on those contributions (collectively, the "Nortel Plan Assets").

3.      The Beneficiaries were participants in and/or are beneficiaries of participants in the DCP; NNI was a Plan Sponsor of the DCP.

4.      The crux of the parties' dispute is whether the DCP qualifies as a "top-hat plan" under the Employee Retirement Income Security Act ("ERISA"), although the Beneficiaries also contend that the Nortel Plan Assets are excluded from the Debtors'

bankruptcy estates regardless of whether or not the DCP is a top-hat plan.

5.      A top-hat plan is a deferred compensation plan that is unfunded and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

6.      Deferred compensation plans that satisfy the top-hat criteria enjoy a near-complete exemption from ERISA's substantive requirements.

7.      Conversely, a deferred compensation plan that fails to meet any of the necessary top-hat requirements -- like the Nortel Plan in this case -- is subject to all of ERISA's substantive provisions and protections.

8.      These substantive provisions and protections include (a) a requirement that plan contributions must be and are held in trust for the exclusive benefit of the plan participants and may not be used or diverted for the benefit of the employer or to satisfy the employer's obligations; and (b) a prohibition against voluntary or involuntary transfer or alienation of plan assets.

9.      Participation in the Nortel Plan was not limited to a select group of highly compensated employees and its Plan Sponsor otherwise failed to comply with the terms of the Nortel Plan.

10.      For these and other reasons, the DCP does not meet the top-hat standards, the Nortel Plan Assets cannot become part of the Debtors' bankruptcy estates, and those sums must be deemed held solely to pay benefits to the Beneficiaries.

11.      Alternatively, if the DCP is not a top-hat plan, the Court should reform the DCP and the trust to conform to ERISA -- including the exclusive benefit and anti-inurement provisions thereof -- and enjoin the Defendants from using the funds for any

purpose other than the payment of benefits to the Beneficiaries.

12.     Alternatively, if the DCP is not a top-hat plan, the Court should impose a trust and/or equitable lien on the Nortel Plan Assets, and enjoin the Defendants from using the funds for any purpose other than the payment of benefits to the Beneficiaries.

13.     Alternatively, if the DCP is not a top-hat plan, but the Court is unable to provide any of the other equitable relief sought with respect to the Nortel Plan Assets, the Court should equitably surcharge the Debtors and each  Committee Member, in an amount equal to the balance of the Nortel Plan Assets as of the date hereof and/or order the Debtors, and each Committee Member to make restitution to the DCP and the Beneficiaries equal to such amount, to remedy the violations of ERISA by each of the Debtors and the Committee Members and the breaches of fiduciary duty by each of the Debtors and the Committee Members  in failing to secure the Nortel Plan Assets for the sole and exclusive benefit of the Beneficiaries.

14.     Even if the Debtors could establish that the DCP was a top-hat plan -- which they cannot -- the Nortel Plan Assets are still excluded from the property of the Debtors' bankruptcy estates under Section 541(b) of the Bankruptcy Code.  Therefore, regardless of the outcome of the top-hat analysis, the Nortel Plan Assets are not assets of the Debtors' estates.

15.     By this Complaint, Plaintiffs seek (a) a declaration that the DCP is not a top-hat plan and therefore subject to all of ERISA's substantive requirements (Count I); (b) the imposition of an implied, constructive, or equitable trust, and/or an equitable lien over the Nortel Plan Assets for the exclusive benefit of the Beneficiaries (Count II); (c) reformation of the DCP and its accompanying grantor trust to incorporate ERISA's

substantive provisions to the extent they are not already provided (Count III); (d) a judgment excluding the assets of the DCP from the Debtors' bankruptcy estates (Count IV); (e) an equitable surcharge against the Debtors and the Committee, or a requirement that the Debtors and the Committee pay restitution, for violations of ERISA and breach of fiduciary duty, and a determination that such amount is also an expense of administration (Count V); and (f) an award of attorneys' fees, and a determination that such amount is also an expense of administration (Count VI).

16. In the alternative, and only to the extent that the Court were to find that the DCP does qualify as a top-hat plan and the Nortel Plan Assets are part of the Debtors' estates, the Complaint seeks a declaration that the Nortel Plan Assets are subject to the claims of the general unsecured creditors only of NNI (Count VII).

### Jurisdiction and Venue

17. This Court has jurisdiction over this Adversary Proceeding under 28 U.S.C. § 157 and 1334, and 29 U.S.C. § 1132(e). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

18. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

### The Parties

19. Horne, Young, Bovarnick, Crisler, Kohnhurst, Page, and Warren are (a) adult individuals; (b) former employees of one or more of the Debtors; (c) participants in and Beneficiaries of the DCP; and (d) members of the governing subcommittee that is authorized to prosecute this action on behalf of the Ad Hoc Group.

20. The Ad Hoc Group consists of the employees and/or former employees of the Debtors listed on Exhibit A hereto, all of whom are Beneficiaries of the Nortel Plan.

21.     The Debtors are the debtors and debtors-in-possession in the above-captioned Chapter 11 cases.

22.     US Bank is the trustee under the Nortel Networks U.S. Deferred Compensation Plan Trust Agreement, as amended and restated.

23.     Robert Ellis Brown, Frank C. Carlucci, L. Yves Fortier, Sherwood Hubbard Smith, Jr., Lynton Ronald Wilson, William Arthur Owens, Robert Alexander Ingram, Richard David McCormick, Harry Jonathan Pearce, Jalynn Hamilton Bennett, John Alan MacNaughton, John Paul Manley, Manfred Bischoff, and Kristina Mary Johnson are members of the Committee, which was charged with administration of the Nortel Plan and constitutes the Plan Administrator under the terms of the DCP.

### Class Action Allegations

24.     Plaintiffs bring this action in their own right and on behalf of the class of all those who are similarly situated.

25.     The prospective class, consisting of over 300 Beneficiaries of the Nortel Plan, is so numerous as to make joinder impracticable.

26.     The issues of law and fact raised by this Complaint -- whether the DCP satisfies ERISA's top-hat requirements and whether the Nortel Plan Assets are or must be held for the exclusive benefit of the Beneficiaries -- are common to all members of the proposed class of Beneficiaries.  The alleged violations of ERISA, and the harm alleged to have been caused by those violations, are common to all members of the proposed class.

27.     The claims of the Plaintiffs, the proposed class representatives, are typical of the claims of the class.

28.     Plaintiffs can adequately represent the interests of the proposed class. Plaintiffs have been active in the protection of the interests of all Beneficiaries through action in the Chapter 11 cases to date, have retained counsel and have independently raised funds to assist in the funding of participation in the Chapter 11 cases and this litigation.

29.     This action may be maintained as a class action under Rules 23(b)(1)(B), 23 (b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, made applicable by Rule 7023 of the Federal Rules of Bankruptcy Procedure.

## Allegations Applicable To All Counts

### A.     The Nortel Plan

30.     The DCP became effective January 1, 2000 as an amendment and restatement of the Bay Networks, Inc. Deferred Compensation Plan (the "Bay Networks Plan").

31.     The DCP incorporated obligations previously incurred under the Bay Networks Plan as well as the Northern Telecom Inc. Agreement Regarding the Deferral Option of the Senior Management Incentive Award Plan and the Executive Management Incentive Plan.

32.     A true and correct copy of the DCP dated on or about January 1, 2000 (the "Original DCP") is attached hereto as Exhibit B.

33.     The Original DCP was subsequently amended several times: on or about March 13, 2000 (the "March 13, 2000 Amendment"); on or about January 1, 2001 (the "January 1, 2001 Amendment"); on or about January 1, 2005 (the "January 1, 2005 Amendment"); on or about January 18, 2008; on or about

November 14, 2008; on or about December 23, 2008; and on or about December 4, 2009.

34.    True and correct copies of the DCP amendments are attached hereto as <u>Exhibits C through I</u>.

35.    The Beneficiaries had no role in negotiating or determining the terms of the Original DCP or its various amendments, and had no ability to influence the terms of those documents. The terms of the DCP were unilaterally determined by the Debtors and the Committee and imposed upon the Beneficiaries.

36.    The DCP claims to provide a "tax-deferred capital accumulation program through the deferral of Salary, Bonuses and Commissions, as well as additional corporate contributions to a select group of management or highly compensated employees of the Company and its subsidiaries." <u>Exhibits B through E at Preamble</u>.

37.    The DCP also claims to be unfunded and unqualified under Section 401(a) of the Internal Revenue Code. <u>Exhibits B through E at Preamble</u>.

38.    The DCP defines "Employer" as NNI or any corporation that would be considered together with the NNI as a single employer pursuant to Code sections 414(b), (c), (m), or (o). <u>Exhibits B through E at Article 1.20</u>.

39.    The Board of Directors of the "Company," as defined in the DCP, was charged with determining the eligibility of employees for participation in the DCP. <u>Exhibits B through E at Article 2.1</u>.

40.    The DCP also contemplates the involvement of the "Committee," which refers to "individuals appointed by the Board" and otherwise serving as "Plan Administrator," with authority to "interpret and administer this Plan and take such other

actions as may be specified herein, in its sole discretion." <u>Exhibits B through E at Article 2.1.</u>

41.     Eligibility for participation in the DCP was separately determined for each plan year -- the twelve-month period beginning on January 1 and ending on December 31 of each calendar year ("Plan Year"). <u>Exhibits B through E at Article 1.27</u>.

42.     The DCP expressly provides that "Eligibility for participation in the DCP shall be limited to key management or highly compensated employees of the Employer." <u>Exhibits B through E at Articles 1.19 and 2.1.</u>

43.     The Nortel Plan further provides that employees eligible to participate in the DCP  ("Eligible Employees") "shall be notified as to their eligibility to participate in the Plan" and that "Total Compensation shall be a factor taken into account…in deciding on the designation of an employee as an Eligible Employee." <u>Exhibits B through E at Article 2.1.</u>

44.      "Total Compensation" is defined in the DCP as including "all base pay amounts paid to the employee and the total of all other amounts paid by the Employer to or for the benefit of an employee for services actually rendered or labor performed for the Employer." <u>Exhibits B through E at Article 1.31</u>.

**B.     Pre-Petition Changes Of The Nortel Plan Sponsor**

45.     The Original DCP identified NNI as the Plan Sponsor, and defined the "Company" to mean NNI. <u>Exhibit B at Preamble and Article 1.14</u>.

46.     The March 13, 2000 Amendment changed the Plan Sponsor from NNI to Nortel Networks Corporation ("NNC"), and defined the "Company" to mean NNC. <u>Exhibit C at Preamble and Article 1.14.</u>

47.    The January 1, 2001 Amendment changed the Plan Sponsor from NNC to Nortel Networks Limited ("NNL"), and defined the "Company" to mean NNL.  Exhibit D at Preamble and Article 1.14.

48.    NNC is the parent of NNL, which in turn is the direct parent of NNI and owns all of NNI's shares of stock.

## C.    The Rabbi Trust

49.    In order to meet the DCP's obligations owed to the Beneficiaries, NNI created an irrevocable grantor trust to hold DCP contributions and earnings thereon separate and apart from funds of NNI and to be administered by its trustee, US Bank (the "Rabbi Trust").  A true and correct copy of the trust agreement for the Rabbi Trust, with amendments (the "Trust Agreement"), is attached hereto as Exhibit J.

50.    The Trust Agreement provides that "[T]he Company and other Employers (as defined in the Plan) will deposit with Trustee money which shall become the principal of the Trust to be held, administered and disposed of, by Trustee as provided in this Trust Agreement."  Exhibit J at Article 1(a).

51.    The Trust Agreement provides, inter alia, that:

> (d)    The principal of the Trust, and any earning thereon shall be held separate and apart from the other funds of the Company and other Employers and shall be used exclusively for the uses and purposes of participants in the Plan and general creditors as herein set forth.  Plan participants and their beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust.  Any rights created under the Plan and this Trust Agreement shall be unsecured contractual rights of Plan participants and their beneficiaries against the Employers.  Any assets held by the Trust will be subject to the claims of the Employers' general creditors under federal and state law *in the event of Insolvency*, as defined in Article 3(a) herein.

<u>Exhibit J</u> at Article 1(d) (emphasis supplied).

52.     Insolvency is defined under the Trust Agreement as the inability to pay debts as they become due or "the Company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code." <u>Exhibit J</u> at Article 3(a).

**D.     The Debtors Cannot Meet Their Burden of Establishing That Participation In The DCP Was Limited To A Select Group Of Highly Compensated Or Management Employees Because They Have No Evidence Of The Actual <u>Compensation Earned By Employees For Several Plan Years</u>**

53.     Assessment of top-hat status requires, among other things, a comparison of the actual earnings of Eligible Employees and the actual earnings of the applicable employee population as a whole.

54.     In order to meet their burden of establishing top-hat status for the DCP, the Debtors must establish actual earnings for all Eligible Employees for each Plan Year.

55.     The Debtors do not have evidence sufficient to establish the actual compensation of Eligible Employees and non-eligible employees for the years 1996 through 2000.

56.     For the year 2001, the Debtors lack actual compensation data for thousands of non-eligible employees.

57.     Without evidence of actual compensation of Eligible Employees and non-eligible employees for each Plan Year, the Debtors cannot meet their burden of establishing that participation in the DCP was limited to a select group of highly compensated or management employees.

**E.      Participation In The DCP Was Not Limited To A Select Group Of Highly Compensated Or Management Employees: In Some Or All Plan Years Substantial Numbers Of Employees Whose TTC Did Not Meet The TTC Threshold Were Nevertheless Deemed Eligible To Participate In The DCP**

58.      Eligibility to participate in the DCP was determined based solely on an employee's Total Targeted Compensation ("TTC").

59.      TTC was comprised of the salary, bonus, and commission expected to be earned by the employee in a given Plan Year.

60.      The Eligible Employees for any given Plan Year were those whose TTC met or exceeded a set dollar threshold (the "TTC Threshold").

61.      The TTC Thresholds for Plan Years 2000 through 2009 were as follows:

      2000:  $145,200
      2001:  $152,400
      2002:  $160,800
      2003:  $160,800
      2004:  $174,000
      2005:  $174,000
      2006:  $174,000
      2007:  $174,000
      2008:  $180,000
      2009:  $180,000

62.      In some or all of the Plan Years, substantial numbers of employees whose TTC did not meet the TTC Threshold were nevertheless deemed eligible to participate in the DCP.

63.      Upon information and belief, in 2001, more than three hundred employees were deemed Eligible Employees even though their TTC failed to meet or exceed the TTC Threshold for that year.

64.      Upon information and belief, in 2002, nearly one hundred employees were deemed Eligible Employees even though their TTC failed to meet or exceed the TTC

Threshold for that year.

65. Upon information and belief, in 2004, more than two hundred employees were deemed Eligible Employees even though their TTC failed to meet or exceed the TTC Threshold for that year.

66. Upon information and belief, in other Plan Years, individuals who were deemed Eligible Employees failed to meet the TTC Threshold for the applicable Plan Year.

67. Because the TTC of a substantial number of Eligible Employees fell short of the TTC Thresholds in some or all of the Plan Years, the Debtors cannot meet their burden of establishing that participation in the DCP was limited to a select group of highly compensated or management employees.

**F.     Participation In The DCP Was Not Limited To A Select Group Of Highly Compensated Or Management Employees: In Some Or All Plan Years, The Actual Compensation Earned By A Substantial Number of Eligible Employees Was Below The TTC Threshold For That Plan Year**

68. In some or all of the Plan Years, the actual compensation earned by a substantial number of Eligible Employees fell below the TTC Thresholds employed by the Committee to determine eligibility to participate in the DCP.

69. For instance, in 2003, more than three hundred fifty Eligible Employees earned actual annual compensation that was below the TTC Threshold for that year.

70. In 2004, nearly four hundred Eligible Employees earned actual annual compensation that was below the TTC Threshold for that year.

71. In 2007, more than one hundred seventy five Eligible Employees earned actual annual compensation that was below the TTC Threshold for that year.

72. Because the actual compensation earned by a substantial number of

Eligible Employees fell short of the TTC Thresholds in some or all of the Plan Years, the Debtors cannot meet their burden of establishing that participation in the DCP was limited to a select group of highly compensated or management employees.

**G.** **Participation In The DCP Was Not Limited To A Select Group Of Highly Compensated Or Management Employees: In Some Plan Years, The Actual Compensation Earned By Certain Eligible Employees Was Below The Average Actual Compensation Earned By The Employee Population As A Whole**

73.      In order to meet their burden of establishing that the DCP qualifies as a top hat plan, the Debtors must demonstrate that there was a significant disparity between the compensation of Eligible Employees and non-eligible employees.

74.      Assessment of that disparity involves, among other things, comparing the average compensation of the total workforce against the actual compensation of the employee who earned the lowest actual compensation of all Eligible Employees.

75.      In order to satisfy the select group requirement, lowest compensation paid to an Eligible Employee must be greater than two times, and usually four or more times, greater than the average compensation of the employee population as a whole.

76.      In Plan Years 2003, 2004, 2007, and 2008, the actual compensation earned by the lowest compensated Eligible Employee was less than the average compensation paid to the entire employee population.

77.      In each Plan Year, the actual compensation earned by the lowest compensated Eligible Employee was less than two times the average compensation paid to the entire employee population.

78.      Because, in some of the Plan Years, the lowest actual compensation earned by some Eligible Employees was below the average actual compensation for the

applicable employee population as a whole, the Debtors cannot meet their burden of establishing that participation in the DCP was limited to a select group of highly compensated or management employees.

79.     Because, in each Plan Year, the actual compensation earned by Eligible Employees was never more than two times the average actual compensation for the applicable employee population as a whole, the Debtors cannot meet their burden of establishing that participation in the DCP was limited to a select group of highly compensated or management employees.

**H.      Participation In The DCP Was Not Limited To A Select Group Of Highly Compensated Or Management Employees: The Debtors Failed Consistently To Apply An Eligibility Methodology That Resulted In A Meaningful Disparity Between Eligible And Non-eligible Employees**

80.     In order to qualify as a top-hat plan, there must be some well-established basis for designating Eligible Employees as "high level" employees.

81.     The Debtors failed to adhere to this standard, and instead reverse engineered the eligibility criteria in order to have the number of eligible employees meet a specific target percentage relative to the total employee population (and exceeded its own preset targets as the company downsized). Instead, in some or all of the Plan Years, the Debtors employed the following methodology:

82.     The Debtors' would choose a dollar amount as the potential TTC Threshold for the upcoming Plan Year and then run a report to show how many employees would meet that threshold.

83.     Taking that number of employees, and dividing it by the total employee population, would yield a percentage of the workforce that would be eligible for DCP participation based on that particular, potential TTC Threshold.

84. Depending upon the results of that analysis, the potential TTC threshold would be adjusted upward or downward until the percentage of Eligible Employees fell at a point that the Debtors deemed acceptable.

85. The Debtors eligibility methodology was based only on obtaining what they deemed a sufficiently small percentage of the workforce as Eligible Employees, rather than identifying a "select group."

86. Moreover, the result of Debtors' procedure was that the TTC of the lowest compensated Eligible Employee was only one dollar greater than the TTC of the most highly compensated ineligible employee; in fact, there was no material difference in income between an Eligible Employee and ineligible employees.

87. This methodology hardly represented an effort to determine a select group of highly compensated employees, which, in turn, dooms the DCP from ever achieving top-hat status.

88. The Debtors and the Committee knew, or should have known, that the DCP did not qualify as a top-hat plan, given the use of a methodology that, as a matter of law, could not and did not limit eligibility to a select group of highly compensated or high-level management employees; the continued dissemination of plan documents and descriptions characterizing the DCP as a top-hat plan was intentionally misleading and prevented the Beneficiaries from taking earlier steps, prior to the Debtors' bankruptcy filings, to protect the Nortel Plan Assets.

I.   **Participation In The DCP Was Not Limited To A Select Group Of Highly Compensated Or Management Employees: The Percentage Of Eligible Employees As Compared To The Total Employee Population Exceeded Permissible Limits**

89.   There exists no bright line for when a plan is too large or too inclusive to satisfy the select group requirement.

90.   Nevertheless, no court has ever conferred top-hat status on a plan where more than 15% of the employee population was eligible to participate. In fact, in the majority of the reported cases, the percentage of the workforce permitted to enroll in a top-hat plan has been less than 5%; in only rare and unusual circumstances would a plan encompassing greater than 5% of the workforce qualify as a top-hat plan.

91.   In some or all of the Plan Years, the percentage of Eligible Employees as compared to the total employee population was so high as to render the population of Eligible Employees not a "select group."

92.   For example, upon information and belief, in 2001, the ratio of Eligible Employees to the applicable employee population as a whole exceeded 15 percent.

93.   Upon information and belief, in 2002, the ratio of Eligible Employees to the applicable employee population as a whole exceeded 10 percent.

94.   Because the ratio of Eligible Employees to the applicable employee population as a whole exceeded permissible limits, the Debtors cannot meet their burden of establishing that participation in the DCP was limited to a select group of highly compensated or management employees.

J.   **The DCP Cannot Qualify As A Top-Hat Plan Because Some Eligible Employees Were Employed By Entities Whose Employees Were Ineligible To Participate In The DCP**

95.   By its terms, participation in the DCP was limited to "Employees" on the

U.S. payroll of "Employers" that adopted the DCP.

96.     Upon information and belief, in some or all of the Plan Years, Employees who were not employed by the Employer as defined in the DCP were, nevertheless, permitted to participate in the DCP.

97.     Upon information and belief, in some or all of the Plan Years, Employees who were not on the U.S. payroll of an Employer adopting the DCP were allowed to participate in the Plan.

98.     Upon information and belief, employees for whom the Debtor was merely a payment agent, and not an employer, were allowed to participate in the Plan.

99.     Because employees who, under the terms of the DCP itself, were ineligible to participate in the DCP were, nevertheless, permitted to participate, the Debtors cannot carry their burden of establishing that the DCP qualifies as a top-hat plan.

**K.     NNL's Attempted Post-Petition Termination of Plan**.

100.    On the Petition Date in these Chapter 11 Proceedings, NNL, the DCP Plan Sponsor, filed for bankruptcy protection (along with its parent, NNC) under the laws of Canada.  Neither NNC nor NNL are parties to the Debtors' Chapter 11 Proceedings.

101.    On or about December 10, 2010 -- nearly a year after the Debtors had initiated these Chapter 11 Proceedings -- the Board of Directors of NNL purported to (a) amend the DCP to change responsibility for sponsorship and administration of the DCP from NNL back to NNI; (b) terminate the DCP, effective as of December 31, 2010; and (c) foist responsibility for sponsorship and administration of the DCP, including termination and related distributions, upon NNI and the other U.S. Debtors.  (These transactions may be referred to collectively as the "Post-petition Sponsorship Transfer").

102.     Neither the Debtors, nor their affiliates sought leave from this Court in relation to the Post-petition Sponsorship Transfer, which occurred well after the Petition Date and was, under any definition, not a transaction in the ordinary course of the business of the Debtors.

103.     NNL's purported termination of the DCP and post-petition attempt to transfer its administration and liabilities to NNI was invalid and without legal effect.

104.     Upon information and belief, on December 10, 2010, NNL was not unable to pay its debts as they came due and was not subject to a pending proceeding as a debtor under the United States Bankruptcy Code.  The sole purpose of the attempted change in the sponsorship of the DCP was to attempt to trigger the Insolvency provisions of the Trust and to expose the Nortel Plan Assets to the possible claims of creditors of the Debtors when, failing such change in sponsorship, the Nortel Plan Assets would have been held for the exclusive benefit of the Beneficiaries, whether or not the DCP is a top-hat plan, under the language of the Trust.

### COUNT I
### Declaratory Judgment
### (All Defendants)

105.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if set forth at length herein.

106.     The DCP is an "employee benefit plan" under ERISA, 29 U.S.C. §1002(3).

107.     As an employee benefit plan under ERISA, unless the DCP falls within a specific exemption under ERISA, the DCP is subject to ERISA's substantive provisions and protections.

108. ERISA's substantive provisions and protections include, without limitation: (a) 29 U.S.C. §1103(c)(1), which provides that contributions to employee benefit plans must be and are held in trust for the exclusive benefit of the plan participants and may not be used or diverted for the benefit of the employer or to satisfy the employer's obligations; (b) 29 U.S.C. §1104(a), which requires the trustee of an employee benefit plan to discharge his duties solely in the interests of participants and beneficiaries; and (c) 29 U.S.C. §1056(d), which prevents the voluntary or involuntary transfer or alienation of plan assets.

109. Upon information and belief, some or all of the Defendants contend that the DCP is exempt from ERISA's substantive provisions because the DCP qualified as a top-hat plan, and, accordingly, that the Nortel Plan Assets are subject to the claims of all or some of the Debtors' general unsecured creditors under the terms of the DCP and/or Trust Agreement.

110. A top-hat plan is an employee benefit plan that is 'unfunded and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees," as provided in 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1).

111. A plan qualifies as a top-hat plan if: (a) the plan is unfunded; (b) it is maintained by an employer primarily for the purpose of providing a deferred compensation for a select group of management or highly compensated employees; and (c) the employees participating in the alleged top-hat plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply.

112.    "Select group" means that the employees eligible to participate are both limited in number and occupy highly compensated and/or high level positions.

113.    The DCP was made available to far more than only a "select group" of employees.

114.    Many employees that were eligible to participate in the DCP were neither highly compensated nor were they management-level employees.

115.    In some or all of the Plan Years, many employees were deemed eligible to participate in the DCP despite failing to meet the TTC Threshold.

116.    In some or all of the Plan Years, many employees were deemed eligible to participate in the DCP despite having actual compensation well below the TTC Threshold.

117.    Moreover, as the following table depicts, in some or all of the Plan Years, the actual compensation earned by the lowest compensated Eligible Employee was either (a) less than the average and median compensation paid to the entire employee population; or (b) less than two times the average compensation paid to such population:

| Plan Year | Lowest Actual Comp Earned By An Eligible Employee | Average Total Compensation For All US Employees | Median Total Compensation For All US Employees | Lowest Actual Comp Of An Eligible Employee As A Multiple Of Average Total Compensation For All US Employees | Lowest Actual Comp Of An Eligible Employee As A Multiple Of Median Total Compensation For All US Employees |
|---|---|---|---|---|---|
| 2000 | Debtors have no evidence | Debtors have no evidence | Debtors have no evidence | N/A | N/A |
| 2001 | Debtors have insufficient evidence | $67,304 | $130,000 | Presently undetermined | |
| 2002 | Debtors have insufficient evidence | $76,104 | $82,900 | Presently undetermined | |
| 2003 | $79,260 | $88,794 | $84,000 | 0.89 | 0.94 |

| 2004 | $63,079 | $100,285 | $93,887 | 0.63 | 0.67 |
| 2005 | N/A | $89,599 | $85,702 | N/A | N/A |
| 2006 | $102,348 | $97,747 | $92,310 | 1.047 | 1.10 |
| 2007 | $50,599 | $101,850 | $129,414 | 0.49 | 0.39 |
| 2008 | $98,238 | $106,724 | $101,759 | 0.92 | 0.96 |

118.     Thus, the DCP was not limited to highly compensated employees.

119.     In some or all of the Plan Years, there was no consistently applied methodology employed in determining eligibility for participation in the DCP. Rather, eligibility criteria were based on the percentage of the total employee population that would meet such criteria.

120.     Upon information and belief, in some or all of the Plan Years, employees were deemed eligible to participate in the DCP despite not being employed by the "Employer" defined in the DCP.

121.     None of the employees deemed eligible to participate in the DCP had sufficient leverage to negotiate or influence the DCP's terms, either individually or collectively. Eligibility for the DCP was not limited to management level employees.

122.     The DCP is not a top-hat plan exempt from ERISA's substantive provisions, including, without limitation, the exclusive benefit and non-inurement rules.

123.     Under ERISA, all Nortel Plan Assets in the Rabbi Trust, or otherwise, are held in trust for the exclusive benefit of the DCP's Beneficiaries, including Plaintiffs, regardless of any language in the Trust Agreement or the DCP to the contrary.

124.     Specifically, the DCP is subject to the "exclusive benefit rule." which provides that all contributions to a plan must be and are held in trust for the exclusive

benefit of the DCP Beneficiaries. As such, they may not be used or diverted for the benefit of the employer or to satisfy the employer's obligations, 29 U.S.C. § 1103(c)(1).

125. The terms of that section of ERISA are implied into and imported within the Rabbi Trust, the Trust Agreement and the DCP by operation of law.

126. The "non-inurement rule" also applies and precludes the Nortel Plan Assets from ever becoming assets of the Debtors' estates because their interest in the funds was severed at the time of the original contribution by the employee under the DCP; such provision of ERISA is implied into and imported within the Rabbi Trust, Trust Agreement and the DCP by operation of law.

127. The Nortel Plan Assets are held in trust for the Beneficiaries under ERISA and are excluded from all of the Debtors' estates.

**COUNT II**
**Imposition of Trust as Redress for ERISA Violations**
**Pursuant to 29 U.S.C. § 1132 and Related Provisions**
**(All Defendants)**

128. Plaintiffs repeat and reallege each and every allegation of this Complaint as if set forth at length herein.

129. The contributions of the Beneficiaries to the DCP and/or all Nortel Plan Assets were held in trust for the exclusive benefit of the Beneficiaries from the moment the contributions were withheld by the Debtors from the compensation of each Beneficiary or paid into the DCP by the Beneficiary, and remain in trust for their exclusive benefit.

130. Any provisions of the DCP, Trust Agreement or Rabbi Trust that are contrary to the exclusive benefit rule, the non-inurement rule or any other substantive provisions of ERISA, or any handling of the Nortel Plan Assets in contravention of such

provisions, constitute a violation of ERISA.

131.     Pursuant to 29 U.S.C. § 1132, the Court can and should order appropriate equitable relief to redress any violations of ERISA.

132.     Pursuant to 29 U.S.C. § 1132, the Court can and should impose an implied, constructive or equitable trust and/or equitable lien on the Nortel Plan Assets in the Rabbi Trust for the exclusive benefit of the Beneficiaries, including Plaintiffs, and order the Trustee to distribute such Nortel Plan Assets consistent with such trust so imposed.

133.     In furtherance of such trust, the Court can and should enjoin the Defendants from distributing any funds from the Rabbi Trust for any purposes other than to pay benefits to the Beneficiaries.

## COUNT III
### Reformation of the DCP and Rabbi Trust as Redress
### for ERISA Violations, 29 U.S.C. § 1132 and Related Provisions
(All Defendants)

134.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if set forth at length herein.

135.     Pursuant to 29 U.S.C. § 1132, the Court can and should reform the DCP and Trust Agreement to delete and/or invalidate any and all provisions contrary to, or which impede the operation of, the exclusive benefit rule, the non-inurement rule or other substantive provisions of ERISA, and to incorporate ERISA's substantive provisions to the extent not already implied into the DCP, Trust Agreement and Rabbi Trust by operation of law.

136.     In furtherance of and in support of such reformation, the Court can and should enjoin the Defendants from distributing any funds from the Rabbi Trust for any

purposes other than to pay benefits to the Beneficiaries.

**COUNT IV**
**The Nortel Plan Assets Are Excluded From the**
**Debtors' Estates, 11 U.S.C. § 541(b)(7) and Related Provisions**
**(Debtors)**

137.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if set forth at length herein.

138.     The contributions of the Beneficiaries to the DCP were held in trust for the exclusive benefit of the Beneficiaries from the moment the contributions were withheld by the Debtors from the compensation of each Beneficiary or paid into the DCP by the Beneficiary, and remain in trust for their exclusive benefit.

139.     The DCP is an "employee benefit plan that is subject to title I of the Employment Retirement Income Security Act of 1974" within the meaning of 11 U.S.C. § 541(b)(7)(A)(i)(I) and/or § 541(b)(7)(B)(i)(I).

140.     All of the Nortel Plan Assets consist of amounts "withheld by an employer from the wages of employees for payments as contributions [to]" and/or "received by an employer from employees for payment as contributions to" an "employee benefit plan that is subject to title I of the Employment Retirement Income Security Act of 1974" within the meaning of 11 U.S.C. § 541(b)(7)(A)(i)(I) and/or § 541(b)(7)(B)(i)(I).

141.     The Nortel Plan Assets are excluded from all of the Debtors' bankruptcy estates pursuant to 11 U.S.C. section 541(b)(7)(A)(i)(I) and/or section 541(b)(7)(B)(i)(I).

**COUNT V**
**Violation of ERISA and Breach of Fiduciary Duty**
**(Debtors and The Committee)**

142.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if set forth at length herein.

143.     Pursuant to the DCP and the Trust Agreement, NNI and the Committee were charged with responsibility for administration of the DCP and preservation of Nortel Plan Assets consistent with ERISA and for the benefit of the Beneficiaries.

144.     NNI and the Committee owed the Beneficiaries unmitigated duties to protect and preserve the Nortel Plan Assets for their benefit, and administer the DCP and the Rabbi Trust solely in the interest of the Beneficiaries.

145.     Pursuant to ERISA, NNI and the Committee owed the Beneficiaries an unmitigated fiduciary duty of care to act with the degree, care and skill of an ordinarily prudent person in discharging like responsibilities and to make all material information known to the Beneficiaries.

146.     Pursuant to ERISA, NNI and the Committee owed the Beneficiaries an unmitigated duty of loyalty, which prohibited self-dealing, misuse of a superior position, and above-all, required fidelity to the Beneficiaries in relation to disposition of Nortel Plan Assets.

147.     Each of the Debtors owed the creditors of their bankruptcy estates, including the Beneficiaries, an unmitigated fiduciary duty of care to act with the degree, care and skill of an ordinarily prudent person in discharging like responsibilities and to make all material information known to the Beneficiaries.

148.     Each of the Debtors owed the Beneficiaries an unmitigated fiduciary duty of care to act with the degree, care and skill of an ordinarily prudent person in discharging like responsibilities and to make all material information known to the Beneficiaries.

149.     Each of the Debtors owed the Beneficiaries an unmitigated duty of loyalty, which prohibited self-dealing, misuse of a superior position, and above-all, required fidelity to the Beneficiaries in relation to disposition of Nortel Plan Assets.

150.     The Debtors and the Committee have breached their fiduciary duties under ERISA and owed to the Beneficiaries by, among other things, (a) failing to administer the DCP in accordance with ERISA and solely in the  interests of the Beneficiaries, including holding the Nortel Plan Assets in a trust for the sole benefit of such Beneficiaries; (b) seeking and/or permitting the post-petition termination of the DCP; and (c) seeking turnover of the Nortel Plan Assets to the Debtors' bankruptcy estates, to the detriment of the Beneficiaries.

151.     The DCP and the Beneficiaries have been harmed by the violations of ERISA and the breach of fiduciary duties committed by the Debtors and the Committee.

152.     The Debtors' and the Committee's violations of ERISA were knowing and intentional, lacking in good faith, and performed with disregard of the rights of the Beneficiaries.

153.     To the extent that the Court does not award the other forms of equitable relief sought in this Complaint, under 29 U.S.C. § 1132,  an equitable surcharge should be entered against the Debtors and each of the Committee Members equal to the current balance of the Nortel Plan Assets held in the Rabbi Trust and/or the Debtors and the

Committee Members should be required to pay restitution in such amount in order to make the Beneficiaries whole, such amount to fund a trust for the exclusive benefit of the Beneficiaries, as required under ERISA.

154.     Since the violations of ERISA and the breaches of fiduciary duty continued after the filing of the Debtors' petitions for relief under Chapter 11 of the Bankruptcy Code, including, without limitation, the Post-petition Sponsorship Transfer, the imposition of surcharge and/or the obligation to pay restitution to the Beneficiaries should be deemed an expense of administration under 11 U.S.C. §503(b) and the doctrine of *Reading Co. v .Brown.*

### COUNT VI
### Attorneys' Fees, 29 U.S.C. § 1132(g) and Related Provisions
### (Debtors and The Committee)

155.     Plaintiffs repeat and reallege each and every allegation of this Complaint as if set forth at length herein.

156.     Pursuant to 29 U.S.C. § 1132(g), in an action under such 29 U.S.C. § 1132, the court may allow reasonable attorneys' fees to the Plaintiffs in this case.

157.     The Court may also award attorneys fees to the Plaintiffs pursuant to Rule 23(h) of the Federal Rules of Civil Procedure made applicable by Rule 7023 of the Federal Rules of Bankruptcy Procedure.

158.     The Debtors and the Committee knowingly and in bad faith violated ERISA in establishing and implementing the DCP, Trust Agreement, and Trust and, accordingly, unnecessarily placed the Nortel Plan Assets at risk, forcing this action.

159.     The Debtors' estates and the Committee Members are capable of satisfying an award of attorney's fees to Plaintiffs.

160. An award of attorneys' fees would deter similar violations of ERISA.

161. This action seeks to benefit all of the Beneficiaries and resolves an important legal question regarding the application of ERISA's substantive provisions to the DCP, Trust Agreement, and Rabbi Trust.

162. Plaintiffs' position as to ERISA's application to the DCP, Trust Agreement, and Rabbi Trust has substantial merit.

163. Any award of attorneys' fees should constitute an administrative expense of the estates under, *inter alia*, the doctrine of *Reading Co. v. Brown*.

**COUNT VII**
**Access To Fund Assets Limited To Certain General Creditors**
**(All Defendants)**

164. Plaintiffs repeat and reallege each and every allegation of this Complaint as if set forth at length herein.

165. To the extent that the Court finds that the DCP is, in fact, a top-hat plan, and that the Nortel Plan Assets are subject to the claims of creditors, the Nortel Plan Assets may only be distributed pursuant to the terms of the Trust Agreement.

166. Under the terms of the Trust Agreement, if the DCP is a top-hat plan and the Nortel Plan Assets are subject to the claims of creditors, the Nortel Plan Assets are subject to the claims of general creditors only of NNI, which creditors share *pro rata* with the Beneficiaries.

167. The term "general creditors" of NNI encompasses only general unsecured creditors of NNI or an affiliate that has formally adopted the DCP, and otherwise excludes creditors of any other Debtors, as well as secured creditors, including those asserting deficiency claims.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter judgment in their favor and against the Defendants as follows:

1.      Certifying the Beneficiaries as a class under Rule 7023, appointing the Plaintiffs as representatives of the class, and appointing the undersigned as class counsel;

2.      Declaring that the DCP does not meet the definition of a top-hat plan under ERISA;

3.      Declaring that the DCP, the Trust Agreement, and Rabbi Trust are subject to all of the substantive protections afforded by ERISA including, but not limited to, the "exclusive benefit rule" and the "non-inurement rule"; and that such provisions are implied into the DCP, Trust Agreement, and Rabbi Trust by operation of law;

4.      Declaring that the Nortel Plan Assets are held in trust for the exclusive benefit of the Beneficiaries;

5.      Declaring that the Nortel Plan Assets are not property of any of the Debtors' bankruptcy estates;

6.      Ordering that any distribution of the Nortel Plan Assets be consistent with ERISA's substantive provisions;

7.      Alternatively, imposing a trust or equitable lien upon the Nortel Plan Assets for the exclusive benefit of the Beneficiaries and ordering that any distribution of the Nortel Plan Assets be consistent with such trust and/or lien;

8.      Alternatively, reforming the terms of the DCP, the Trust Agreement and/or Rabbi Trust to make them consistent with, and to import the terms of, ERISA's substantive protections and to provide that the Nortel Plan Assets are held in trust for the

exclusive benefit of the Beneficiaries and ordering that any distribution of the Nortel Plan Assets be consistent with such reformed plan and trust;

9.    To the extent that the Court does not award the other forms of equitable relief sought in this Complaint, imposing, under 29 U.S.C. § 1132, an equitable surcharge against the Debtors and each of the Committee Members equal to the current balance of the Nortel Plan Assets held in the Rabbi Trust and/or requiring the Debtors and the Committee Members to pay restitution in such amount in order to make the Beneficiaries whole, such amount to fund a trust for the exclusive benefit of the Beneficiaries and, further, declaring the imposition of surcharge and/or the obligation to pay restitution to the Beneficiaries to be an expense of administration under 11 U.S.C. §503(b) and the doctrine of *Reading Co. v Brown;*

10.    Awarding to the Plaintiffs the amount of their attorneys fees and costs incurred in investigating and prosecuting this action; *inter alia,* under 29 U.S.C. §1132(g) and finding that such award constitutes an administrative expense of the Debtors' estates under 11 U.S.C. §503(b) and the doctrine of *Reading Co. v Brown*; and

11.    Alternatively, and only in the event the Court finds the DCP to be a top-hat plan, finding that only general creditors of NNI (and no other Debtor) share with the Beneficiaries in the Nortel Plan Assets, and defining "general creditors" to exclude all secured creditors, including as to deficiency claims, and all administrative and priority claims.

Dated:   December 23, 2011        **BLANK ROME, LLP**

*/s/  Bonnie Glantz Fatell*
Bonnie Glantz Fatell (No. 3809)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
(302) 425-6400 (telephone)
(302) 425-6464 (facsimile)
Email:   fatell@blankrome.com

-and-

**BERNSTEIN, SHUR, SAWYER &
NELSON**

Robert J. Keach
Paul McDonald
Daniel J. Murphy
Admitted *Pro Hac Vice*
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
(207) 774-1200 (telephone)
(207) 774-1127 (facsimile)
Email: rkeach@bernsteinshur.com
       pmcdonald@bernsteinshur.com
       dmurphy@bernsteinshur.com

*Counsel for Plaintiffs*